J-S06027-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF C.E.P., AN INCAPACITATED PERSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.J.P. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2357 EDA 2023 |

Appeal from the Decree Entered August 11, 2023
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2015-E0692

BEFORE:  DUBOW, J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED JUNE 4, 2024**

R.J.P. ("Father") appeals from the Orphan's Court decree removing him as guardian of the person of his son, C.E.P. Father claims the court erred in removing him as guardian of the person, in failing to follow proper removal procedures, and in failing to appoint other family members as guardian. Father further claims that the court erred when it denied his continuance request and when it denied his request to have C.E.P. testify. We affirm.

In October 2015, Father filed a petition for guardianship of C.E.P, alleging C.E.P. was incapacitated. After a July 2016 hearing, the court appointed Father as guardian of the person and estate and granted Father's request that C.E.P. move to a facility in Morrisville, Bucks County. At the hearing, the court questioned Father to ensure Father understood that he had to keep C.E.P.'s funds separate from his and his wife's funds. The court asked Father, "[I]f you were to be appointed . . . guardian of your son's estate, it

means you have to take care of his finances and segregate any monies that he may receive. You understand that. Correct?" N.T., Jul. 21, 2016, at 36. Father responded that he did. The court then stated that, "When I say segregate them, segregate them from your own and your wife's funds. You understand that." *Id.* at 36-37. Father responded that he understood. *Id.* at 37.

In September 2021, court-appointed counsel for C.E.P., Richard D. Magee, Jr., Esquire, petitioned the court for C.E.P. to move to a new community living arrangement in Feasterville, Bucks County ("Feasterville Residence"). The disability resource and service provider, Growth Horizons, proposed C.E.P. move to the Feasterville Residence in part because he had been exhibiting aggressive and violent behaviors. The petition alleged C.E.P. supported the move, liked the home, knew at least one of the residents, and the relocation would remove him from the presence of a neighbor that he fixated on when upset. The petition maintained that Father refused to permit his son to move despite C.E.P.'s wishes and the recommendations of the staff and health care professionals.

The court continued an abbreviated hearing on the petition, at Father's request. After the continuance, counsel entered an appearance for Father. Attorney Magee filed an amended petition, in which he alleged that when Father returned C.E.P. to C.E.P.'s home following the abbreviated hearing, Father began "to yell in a threatening manner to staff, including intentionally standing in an uncomfortably close proximity to one staff member," and

- 2 -

disregarded requests from staff and refused to leave until staff called 911. Amended Petition for Review, filed Oct. 13, 2021, at ¶ 5. Growth Horizons issued a no-trespass notice to Father. Attorney Magee amended the petition to request that Father be removed as plenary guardian of C.E.P.'s estate and person.

In November 2021, by agreement of the parties, the court enter a final decree modifying the 2016 decree. The parties agreed at a hearing that C.E.P. would move to the Feasterville Residence within the following 14 days. N.T., Nov. 1, 2021, at 2-3. Counsel for C.E.P. stated that the parties agreed that Father would remain guardian of the person, but that that the operating officer of ARC Alliance, Pat Leo, would be guardian of C.E.P.'s estate. *Id.* at 3. C.E.P.'s counsel stated that the parties further agreed that C.E.P. would have a weekly allowance and that Father "shall cooperate in all respects to facilitate his son's move to" the Feasterville Residence and "shall support [C.E.P's] living arrangements at this address in all respects and shall be respectful to staff and other residents at this community living arrangement."[1] *Id.* at 3-4. Attorney Magee said that the parties agreed that the decree would "reflect the recognition and acknowledgement that [Father] as the plenary guardian of the person and as an interested party in this matter, had concerns regarding the

_____

[1] The parties also agreed that Father would not require C.E.P. to telephone every evening and that C.E.P. would determine the timing and frequency of the calls. N.T., Nov. 1, 2021, at 4.

- 3 -

traffic, noise pollution and the air pollution at this new address, including concerns about traffic fatalities." *Id.* at 4.

After Attorney Magee detailed the agreement, and following a discussion between Father and his counsel, Father's counsel stated that Father agreed except for "replacement . . . [of] the guardian of the estate by the Arc [sic]." *Id.* at 5-6. The court then questioned whether an agreement had been reached:

> THE COURT: Well, gentlemen, you represent there's an agreement and, obviously, that's an important consideration.
>
> THE FATHER: It was a misunderstanding, Your Honor.
>
> THE COURT: There's no misunderstanding -- that's not a misunderstanding. That's the opposite of what was represented to me. That's not a misunderstanding. So either there's an agreement or there's not.
>
> [Father's counsel], I know that you're an honorable officer of the Court. I'm sure you thought there was an agreement. It sounds like your client --
>
> [FATHER'S COUNSEL]: That was my -- yes, that was my understanding.
>
> THE COURT: So your client changed his mind in the last five minutes.
>
> THE FATHER: I wasn't aware of it -- that's the stipulation.
>
> THE COURT: I don't believe that for a minute, to be honest with you. [Father counsel]'s a thorough attorney. That's an important part of your negotiation that you just went through for a half hour.

*Id.* at 6-7.

After further discussion between Father and his counsel, Father's counsel stated: "It is agreed . . . that Arc [sic] will be the guardian of the estate." *Id.* at 7-8. Counsel further clarified the language regarding Father's concerns, stating the paragraph should state the guardian's concern "with regards to the move to [the Feasterville Residence] is based on the . . . high pedestrian fatality rate in the area of the placement, together with [C.E.P.'s] prior history of elopement." *Id.* at 8. Counsel further stated that there would be a statement that either party can return to court after three months if there were ongoing concerns. *Id.* Father's counsel conducted a colloquy of Father. *Id.* at 11-12.

The final order required, among other things, that Father "immediately cooperate in all respects to facilitate [C.E.P.'s] move to" the Feasterville Residence and that "[C.E.P.] shall live at this address until further Order of this Court." Order, Nov. 9, 2021. It further removed Father as guardian of the estate and appointed ARC Alliance. *Id.* The order required that Father "immediately provide the necessary information, including account number(s) and representative payee bank statements, to the successor guardian of the estate to facilitate the successor guardian's control and protection of the incapacitated person's income and assets." *Id.*

In February 2023, Father filed a petition for review. He alleged that he had entered the November 2021 agreement under duress. He set forth his concerns with C.E.P.'s current placement, including that C.E.P.'s health and quality of life allegedly had deteriorated since his relocation; C.E.P. was not

- 5 -

compatible with his housemates; the traffic and noise levels in the neighborhood were unacceptable; and the location of the group home posed a burden on Father and C.E.P.'s mother, L.P. ("Mother"). Father also raised concerns that ARC Alliance allowed C.E.P. to purchase items that encouraged C.E.P.'s alleged "hoarding tendencies" and claimed that C.E.P. often did not have sufficient funds for purchases when he was with his parents. Petition for Review, filed Feb. 14, 2023, at ¶¶ 14-15. The petition further alleged that "the Attorney paid for by the Citizens of the Commonwealth, presenting the False Narrative, was negligent in finding the facts of this matter and failed to act in the best interests of [C.E.P.]" *Id.* at ¶ 3. The petition requested that C.E.P. be moved but did not provide an alternate location. Father also sought to be appointed guardian of both the estate and person, and that, in the event of his demise or incapacitation, requested that plenary guardianship go to Mother and then to C.E.P.'s brother, R.P., ("Brother").

At a hearing on the petition, Father appeared *pro se*, maintaining that he had attempted to get an attorney, but did not hear back. N.T., May 26, 2023, at 5. He further stated that because there had been no written responses to the Petition for Review, he "assumed there was no objection by any parties involved and that this matter was likely to be settled in a prehearing conference with His Honor," and therefore he did not pursue an attorney. *Id.* at 6. He said he did not know that C.E.P.'s counsel, Attorney Magee, would be permitted to introduce evidence without notifying him and "just assumed standard court practices," as that is what he had "seen on TV."

*Id.* at 86. Father stated that he was not capable of representing himself in a "full hearing, with examination and cross examination." *Id.* at 7.

Attorney Magee argued that the court had provided Father "ample time to retain counsel if he wanted" and that any expectation that they "would reach an agreement based on his pleadings [was] simply not credible." *Id.* at 9. He stated that "[Father] has done this before, where he gets a continuance because he says he needs counsel." *Id.* Father admitted he had requested continuances on prior petitions. *Id.* at 10-11. Attorney Magee further stated that the matter "stresses [C.E.P.] out, when it is just percolating, and [Father] had plenty of time to prepare, whether he's retaining counsel or not." *Id.* at 9. Attorney Magee also pointed out that he was the attorney referenced in Father's petition and asked that the court proceed with the hearing because Father had made "serious and unsubstantiated allegations" about him and he "respectfully asked the [c]ourt to demand that [Father] go forward and present evidence." *Id.*

Father accused the judge who had presided over the November 2021 hearing[2] of bias. When responding to a question about the prior decree, he accused the prior judge of prejudice, stating, "I even perceived prejudice from the bench, to be quite frank." *Id.* at 14. He stated that he "didn't wish this suspicion of prejudice to be the primary issue, and, indeed, now [he is] fearful moving forward . . . ." *Id.* at 19. He claimed that the trial judge had questioned

_____

[2] A different judge was presiding over the May 2023 hearing.

his integrity and character and he "felt [he] didn't have a chance. [He] had to agree." *Id.* at 20. The orphans' court refused a continuance and proceeded with the hearing. *Id.* at 22.

Father presented the testimony of Brother and Mother. Brother agreed that if Father was not guardian, then guardianship should go to Mother and then to him. *Id.* at 27. Brother testified that C.E.P. had lost weight since he moved to the Feasterville Residence and that "[i]n passing, [C.E.P. has] talked about how [his roommates] irritated him at times." *Id.* at 28. He testified that Father always has C.E.P.'s interest in mind and that Father was a good protector. *Id.* at 29. Brother testified that C.E.P. likes to collect things but said he would not characterize it as hoarding. *Id.* at 29-30. Brother testified that C.E.P. had not directly expressed to him a desire to live elsewhere, but that he has heard conversations about C.E.P.'s desire to move, and he thinks C.E.P. would like to live closer to his parents. *Id.* at 30-32. Brother testified that he had not visited C.E.P. at the Feasterville Residence and that he sees him when he visits Father and Mother. *Id.* at 32. Brother agreed that C.E.P. loves Father and would want to please him. *Id.* at 33.

Mother testified that C.E.P. expressed a desire to move closer to her and Father. *Id.* at 35. She stated that she also would like C.E.P. to move closer, as it is a long drive and if he was closer she could see him more. *Id.* She testified the traffic near the Feasterville Residence was difficult, especially on Street Road and that she had witnessed an accident. *Id.* at 35-36. Mother shares Father's concerns regarding elopement and traffic. *Id.* at 36. She

testified that C.E.P. does not seem to interact with his roommates. *Id.* at 36-37. She testified that she would be willing to serve as guardian of C.E.P.'s estate and person if Father was not guardian. *Id.* at 37-38. She testified that she has seen C.E.P.'s hoarding tendencies, stating that "[h]e does tend to want to buy something every week, and it seems to be several items of certain things." *Id.* at 38. Mother was asked about the alleged bias, and stated that the court felt Father should have known about the "transfer of the monies, the management of the estate, and my husband did not. That's where I think the bias thing may come into play here." *Id.* at 46. When asked to clarify, Mother stated, "My husband did not know that the management of [C.E.P.'s] estate would be taken away from him, when he came into [the courtroom in November 2021]. And the judge pointed out — I don't know his exact words — but he says, certainly you did. Okay. And my husband did not." *Id.* When asked if that was the bias Father referred to, she stated, "Well, if that's considered bias, yeah." *Id.*

The residential director of RHA Growth Horizons and acting supervisor over the Feasterville Residence, Linda Early, testified next. *Id.* at 51. She stated that C.E.P. had lost weight, and that he had lost more weight since he left workshop in December, because he no longer had snacks. *Id.* at 52. Early did not agree that C.E.P.'s emotional stability had deteriorated. *Id.* She stated C.E.P. had struck three people since moving to the Feasterville Residence. *Id.* Early testified that C.E.P. has expressed a desire to relocate to be closer to Father. *Id.* at 54-55. She stated that she believed that Father feels that he

does what is best for C.E.P. and that Father has the "best intentions." *Id.* at 55-56. Early testified that C.E.P.'s room has a lot of possessions, but they are neatly organized. *Id.* at 56. When asked by the court whether the items were in C.E.P.'s best interest, Early responded that "if something makes him happy, it's in his best interests" and agreed the items gave him comfort and satisfaction. *Id.* at 57.

Early testified that C.E.P. lives in a nice, residential neighborhood that was not on Street Road and elopement had not been a problem at this residence. *Id.* at 64-65. She testified that they do not hear traffic noise at the house. *Id.* at 76. Early stated there was no clinical reason to consider moving C.E.P. *Id.* at 65. She testified that Father postponed the Individual Support Plan ("ISP") meeting for the year until after the court hearing, and the ISP needed to be approved by the county by June 10. *Id.* at 68-69.

Father next attempted to call C.E.P. as a witness, and C.E.P.'s counsel requested that the court defer a decision on whether C.E.P.'s testimony was needed until the end of the hearing:

> [FATHER]: [C.E.P.], please come to the stand.
>
> MR. MAGEE: I object, Your Honor.
>
> THE COURT: Hold on. I object, too. I want to hear the objection.
>
> MR. MAGEE: The objection is I would like the Court to defer in allowing the incapacitated person to testify. I would like the Court to hear the other witnesses, including the cross-examination of [Father], before the Court makes that decision.

THE COURT: All right. We can defer that. We're going to defer calling your son as a witness.

[Father]: Okay. I have to --

THE COURT: Do you believe it's in his best interests for him to testify?

[FATHER]: Absolutely.

THE COURT: It's in his best interests?

[FATHER]: The law allows it and prefers it.

[COUNSEL FOR ARC]: It's very stressful.

THE COURT: You don't think this causes him stress? Mom?

[FATHER]: I am concerned about that, yes.

[MOTHER]: No, I think he'll be fine.

THE COURT: You both think he'll be fine? Okay.

[FATHER]: I don't mean the testimony, but the duration of it, staying here longer.

[FATHER]: I thought you meant --

THE COURT: Let's do this. Let's have [C.E.P.] hold on for now and let the other witnesses testify, and then we'll come back to this issue.

[FATHER]: Your Honor, but there's the issue of his emotional stability and whether he can endure more time in this courtroom.

THE COURT: You filed this Petition, sir.

[FATHER]: Maybe you're not -- I don't want an outburst from him being impatient.

MR. MAGEE: It's very sad, because this type of proceeding is very stressful for [C.E.P.]. And this has been going on since 2015, 2016.

THE COURT: Yes. That's the Court's concern. You're not concerned about that?

[FATHER]: Wait a minute. I just said I'm concerned about him having an outburst if he remains much longer.

THE COURT: But you wanted to have this hearing.

[FATHER]: Okay. I'm not sure --

THE COURT: You asked that he be here.

[FATHER]: Indeed. I thought we were going to be done in a half-hour.

THE COURT: I don't think so. No. Why did you think that?

[FATHER]: Because there was a prehearing at the last -- I'm sorry, Your Honor, for raising my voice.

*Id.* at 87-89.

Father then presented videos and audio clips meant to demonstrate that the neighborhood was too loud and was dangerous for pedestrians and that C.E.P. had hoarding tendencies. He further testified that C.E.P.'s card with money did not work 15 to 20 times when C.E.P. was with Father. *Id.* at 145.

Attorney Magee then presented testimony, first calling Father as a witness. When asked to look at the exhibits Attorney Magee had provided at the start of the hearing, Father said he took them home during the break and did not bring them back, stating, "I didn't want to extend this session. I left them at home." *Id.* at 144. Father agreed that when he entered the November 2021 agreement he had been worried that he would be stripped of both guardian of the estate and of the person. *Id.* at 153-54. Father testified that in 2021, he had two bank accounts for C.E.P., one checking and one savings. *Id.* at 157-58. C.E.P.'s money went into the accounts and at that time Father controlled it. *Id.* at 159. He conceded that on September 7, 2021, a transfer

- 12 -

from C.E.P.'s account to Father and Mother's joint account occurred in the amount of $1,200, and on September 24 a transfer in the amount of $900 occurred. *Id.* at 161-62, 165. An $800 transfer took place in October, and a transfer of $920 in November. *Id.* at 163, 165. Father stated that he was entitled to C.E.P.'s money "[t]o compensate what [Mother and Father] spend of [their] money, to pay for the heat and the electric when he comes to visit, to pay for transportation." *Id.* at 163-64. Father stated, "If he goes to a hotel, they're going to charge him $100 a night." *Id.* at 165. He claims C.E.P. spends ten to 15% of his time at Father's house, and they buy him shoes, clothing, gas, and electricity. *Id.* Father further agreed that he closed C.E.P.'s accounts between November 1 and November 9, 2021, claiming he had to close them because Father's name was on the accounts and he did not want ARC Alliance to have his social security number. *Id.* at 166-67. Father said he did not pay Growth Horizons, who operated C.E.P.'s prior community living arrangement, from September through November 2021, claiming payment was not required because there was no contract. *Id.* at 167-68. The day before the court entered the order removing Father as guardian of the estate, he opened a new bank account for C.E.P. *Id.* at 175.

A guardian fiduciary specialist with the ARC Alliance, Wareen Romeo, testified that she oversees C.E.P.'s estate accounts. *Id.* at 180. She testified that C.E.P receives discretionary spending — $20.00 per week on his PEX card, which is like a credit card, and then $200 in cash, sent to the facility, each month. *Id.* at 181.

- 13 -

Romeo stated that when the guardianship transferred, Father did not provide any financial information and she therefore requested information from the bank for a five-year period. *Id.* at 182. She testified that the two accounts had been closed, and a new one opened in November 2021, and testified as to the transfers from the accounts to Father and Mother's joint accounts. *Id.* at 183-84. She said she contacted the bank for statements for the account into which the funds were transferred, but the bank could not provide the statements because the accounts did not belong to C.E.P. *Id.* at 184. She stated that when ARC Alliance became guardian, C.E.P.'s bank account balance was $161.74. *Id.* at 185. Romeo also testified about activity logs that ARC keeps that chronicle various activities that occurred as to C.E.P., including instances after entry of the November 2021 order where Father continued to express concern about the Feasterville Residence. *Id.* at 186-88. She further testified as to an entry regarding a March 2022 ISP meeting, where Father had been difficult throughout the meeting and kept telling C.E.P. to say he did not like the new home and that it was unsafe. *Id.* At the meeting, Father was verbally aggressive toward the support coordinators and told them to add things in the ISP such as, "I do not like my house," and "I do not feel my house is safe." *Id.* at 190. She stated C.E.P did not say these things and when asked directly what he wanted, C.E.P. went quiet. *Id.* at 190-91. She further testified as to entries in 2022 that stated that Father continued not to provide financial information. *Id.* at 191-92.

At the conclusion of the hearing, the court determined that it did not need C.E.P.'s testimony. *Id.* at 206. It denied Father's petition for review, in August 2023, and ordered that ARC Alliance would remain plenary guardian of C.E.P.'s estate, removed Father as plenary guardian of the person, and appointed ARC Alliance as plenary guardian of the person. Final Decree, Aug. 11, 2023. The court also required Father to provide ARC Alliance the necessary information including account numbers and representative bank statements to facilitate the guardian's control and protection of C.E.P.'s income and assets. *Id.* The court further ordered Father and Mother to reimburse C.E.P.'s estate $3,820, "which represents the monies improperly diverted from [C.E.P.'s] account in September, October, and November 2021." *Id.* The court further ordered Father to provide an informal accounting including of monies diverted to his and Mother's joint account, or any other account, from September 14, 2016 through November 9, 2021. Father timely appealed.

Father raises the following issues:

> [1.] Whether the trial court committed an error or law and abused its discretion in removing [Father] as Guardian of the Person of his son, [C.E.P.], an incapacitated person and replacing him with a corporate guardian when the evidence failed to establish removal by clear and convincing evidence; the Court failed to follow proper removal procedures; other family members were available and willing to serve as guardian; and [Father] was not on notice his removal was before the court?
>
> [2.] Whether the trial court abused its discretion, violated [Father's] due process rights, and exhibited manifest bias in denying the request for [Father] for a continuance so that he could retain counsel as he was not on notice that counsel

- 15 -

for the incapacitated person, [Attorney] Magee, sought his removal as Guardian of the Person?

[3.] Whether the trial court committed an error of law and abused its discretion by denying the request for the Incapacitated Person to testify at the Review Hearing so that wishes and desires of the Incapacitated Person were heard?

Father's Br. at 10-11 (proposed answers omitted).

In his first issue, Father raises three separate issues — whether the court erred in finding the evidence supported Father's removal as guardian of the person, whether the court failed to follow proper procedures when removing Father as guardian, and whether the court erred in appointing a third party as guardian, rather than Mother or Brother.

First, Father argues that removal of a fiduciary is a drastic action that should be taken only if the estate or welfare of the incapacitated person is endangered and intervention is needed to protect the incapacitated person. He argues that a person moving to remove a guardian must prove removal is necessary by clear and convincing evidence. He claims the court erroneously based his removal as guardian of the person of C.E.P. on Father's alleged breach of fiduciary duties, failure to follow the orders of the court, and failure to prioritize C.E.P.'s interests.

Father contends that "[t]he issue of the finances was already settled during the November 9, 2021 Final Decree in which [Father] was replaced as the Guardian of the Estate per an agreement." Father's Br. at 18. He notes the allegations that Father improperly reimbursed himself are from allegedly improper transactions that occurred from September through October 2021,

and since November 2021, he has had no access to C.E.P.'s funds. He claims the allegations were over 18 months old and known to Attorney Magee. and to the guardian of the estate, but neither filed a petition for review. He claims the allegations are relevant to his petition to regain appointment as guardian of the estate, but stale and irrelevant as to his role as guardian of the person.

Father further claims the court's reasons for finding he failed to comply with court orders are that he displayed difficult behavior toward the staff and C.E.P.'s caretakers, he disagreed with C.E.P.'s discretionary spending, and he worried about hoarding behaviors. Father argues that during C.E.P.'s residency in Feasterville, Father has had concerns regarding his weight loss, aggression toward others, and hoarding tendencies. He claims C.E.P. has expressed a desire to relocate, and Father "championed the move as an advocate for his son due to concerns of high traffic and [C.E.P.'s] history of elopement." *Id.* at 20. He maintains that although he was ordered to work with Growth Horizons, he had an obligation as guardian of the person to advocate on C.E.P.'s behalf and hold service providers accountable. Father further argues that his concerns regarding C.E.P.'s discretionary spending are not a violation of a court order, because he is not guardian of the estate. He argues that "[w]ithout control of the purse strings and withholding of funds for the discretionary spending by [C.E.P.], which [Father] has neither, it is impossible for [Father] to violate a court order for this conduct." *Id.* at 21.

Father also maintains that the court's final reason for removal — that Father does not prioritize C.E.P.'s interests when C.E.P. expresses wishes

different from Father's — is not supported by the record. He claims the mild disagreements regarding discretionary spending and hoarding does not establish C.E.P.'s welfare is endangered and intervention is necessary. He maintains a claim that he can be difficult is not grounds to remove him as guardian.

We review an order removing a guardian for an abuse of discretion. ***In re Estate of Border***, 68 A.3d 946, 959 (Pa.Super. 2013). Pursuant to statute, an orphans' court has the power to remove a personal representative if the representative is wasting or mismanaging the estate or has failed to perform a duty imposed by law, or his remaining in office would jeopardize the interests of the estate:

> The court shall have exclusive power to remove a personal representative when he:
>
> (1) is wasting or mismanaging the estate, is or is likely to become insolvent, or has failed to perform any duty imposed by law; or
>
> . . .
>
> (5) when, for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office.

20 Pa.C.S.A. § 3182.[3] A court may summarily remove a guardian when removal is necessary to protect the rights of parties in interest:

> The court on its own motion may, and on the petition of any party in interest alleging adequate grounds for removal

---

[3] 20 Pa.C.S.A. § 5515 (incorporating the grounds for removal of personal representative under 20 Pa.C.S.A. §§ 3182 and 3183 to removal of guardian of an incapacitated person).

- 18 -

shall, order the personal representative to appear and show cause why he should not be removed, **or, when necessary to protect the rights of creditors or parties in interest, may summarily remove him**. . . . Any personal representative summarily removed under the provisions of this section may apply, by petition, to have the decree of removal vacated and to be reinstated, and, if the court shall vacate the decree of removal and reinstate him, it shall thereupon make any orders which may be appropriate to accomplish the reinstatement.

*Id.* at § 3183 (emphasis added).

Here, the orphans' court found removal necessary because Father breached his fiduciary duties, failed to follow court orders, and did not prioritize C.E.P.'s best interests:

> Grounds for removal here are clear, as requested by [Attorney Magee], attorney for [C.E.P.]. [Father] has grossly breached his fiduciary responsibilities, failed to follow Orders of this Court, and does not prioritize the best interests of his son when [C.E.P.] has expressed wishes different from his father. [Father's] explanation as to why he does not need to keep his finances separate from [C.E.P.'s] finances comes from his own feelings and beliefs as to what he can do and is not based on any law of this Commonwealth. [Father] further failed to pay for three months of [C.E.P.'s] care in 2021 while he simultaneously moved $3,820.00 of [C.E.P.'s] funds to an account jointly held by [Father and Mother]. Unfortunately, he has further made it difficult on staff who are responsible for [C.E.P.'s] care in ISP meetings and had become so problematic on the premises of [C.E.P.'s] residence that a no trespass order was issued by the care provider. [Father] even takes issue with providing [C.E.P.] spending money despite the goal of providing [C.E.P.] with money to promote his independence and development.
>
> The November 9, 2021 Final Decree provided that the money [C.E.P.] is to receive weekly (not less than $40.00 and not to exceed $80.00) is within the "sole discretion of [C.E.P.]." Sadly, his father does not support [C.E.P.'s] purchases - to the point of calling it "hoarding." However,

> the photographs of [C.E.P.'s] room provided to the undersigned belie this conclusion.
>
> Under Pennsylvania law, the Court, at the request of the parties or on its own, may remove a guardian when adequate grounds for removal exist. 20 Pa. C.S.A. § 3183. [Father] cited to the laws regarding removal at the hearing and evidenced that he knew or should have known, as an "experienced *pro se*" litigant, that the court may remove a guardian on their own if adequate grounds have been alleged. Removal of one of the guardians was the express purpose of the hearing before the undersigned. At a prior guardianship hearing, Attorney Magee unsuccessfully requested removal of [Father] as guardian of both the person and the estate. As noted by [Attorney] Magee at the May 26, 2023 hearing, the expectation that they would come to court on May 26 and reach an agreement based on his pleadings is simply not credible. The Court agrees. [Father's] assertion that the present hearing was going to be uncontested is simply not credible. The Court further finds no evidence that [Father] only agreed to the November 9, 2021 Final Decree under the guise of duress.

Trial Court Opinion, filed Nov. 3, 2023, at 16-18.

The court did not abuse its discretion. The record supports the court's findings that Father breached his fiduciary duties. The breaches included when he transferred funds from C.E.P.'s bank account to a joint account owned by Father and Mother and when he did not pay C.E.P.'s prior home. Further, the record supports that Father did not follow court orders in that he did not cooperate with the new guardian of the estate by providing financial information and did not support C.E.P.'s move to the Feasterville Residence. The record further supports that Father did not prioritize C.E.P.'s best interests, including C.E.P.'s having control over spending money. Taken

together, the evidence supports the court's finding that removal of Father as guardian of the person was required to protect C.E.P.'s rights.

Father next maintains the orphans' court failed to follow proper procedures when removing him as guardian of the person because no petition was filed. He claims the court did not make its own motion and did not order Father to show cause why he should not be removed as guardian of the person, but rather summarily removed him. He argues this was improper because he was not guardian of the estate and therefore removal was not necessary to protect creditors, parties in interest, or C.E.P. He therefore argues the court was required to make a motion and order Father to appear and show cause why he should not be removed. He argues the purpose of the requirements in 20 Pa.C.S.A. § 3183 is to provide notice.

As discussed above, the orphans' court may summarily remove a guardian where removal is necessary to protect the rights of parties in interest. 20 Pa.C.S.A. § 3183. The trial court did not abuse its discretion in summarily removing Father as guardian of the person. As discussed above, Father's removal as guardian of the person was necessary to protect C.E.P.'s interests.

Father next maintains the court erred in appointing a third party as guardian of the person, and not Mother or Brother. He maintains both testified they would serve as guardian of the person, and the court's statement they were unprepared is flawed. He asserts there was no notice that Father's status as guardian of the person would be at issue.

Here, the trial court found that Mother "made it very clear that she defers to her husband for C.E.P.'s care," pointing out that Mother testified that she was not part of the conversations with the attorney in November 2021 and had not read the final decree. Trial Ct. Op. at 7 (citations omitted). It noted Mother had not read the petition Father filed, but relied on it, and found her opinions and decisions cannot be separated from Father's, "which can be further inferred by her agreement with almost every question asked by [Father.]" *Id.* (citation omitted). The court further pointed out that Brother conceded that he had not visited C.E.P. at the Feasterville Residence and that he only saw C.E.P. at family gatherings or if he is at his parents' house when C.E.P. also was visiting. *Id.* at 14. The court found the record was "devoid of any testimony from either [Mother] or [Brother] as to why they are qualified or how they would be able to change their present lifestyles to take on the role of plenary guardianship of [C.E.P.]." *Id.* at 14-15. It stated that both deferred to Father to care for C.E.P.

In Pennsylvania, the court may appoint a guardian and a family relationship, by itself, will not be considered an interest adverse to the incapacitated person's interest:

> **(f) Who may be appointed guardian.--**The court may appoint as guardian any qualified individual, a corporate fiduciary, a nonprofit corporation, a guardianship support agency under Subchapter F (relating to guardianship support) or a county agency. In the case of residents of State facilities, the court may also appoint, only as guardian of the estate, the guardian office at the appropriate State facility. The court shall not appoint a person or entity providing residential services for a fee to the incapacitated

person or any other person whose interests conflict with those of the incapacitated person except where it is clearly demonstrated that no guardianship support agency or other alternative exists. Any family relationship to such individual shall not, by itself, be considered as an interest adverse to the alleged incapacitated person. If appropriate, the court shall give preference to a nominee of the incapacitated person.

20 Pa.C.S.A. § 5511(f).

The Pennsylvania Rules of Orphans' Court also contain provisions governing the selection of a guardian. They provide that if a person has not been nominated by the incapacitated individual, the court should consider appointing the guardian of the estate as guardian of the person:

> **(b) Selection of Guardian.** If guardianship services are needed, then the court shall appoint the person nominated as such in a power of attorney, a health care power of attorney, an advance health care directive, a mental health care declaration, or mental health power of attorney, except for good cause shown or disqualification. Otherwise, the court shall consider the eligibility of one or more persons to serve as guardian in the following order:
>
> (1) Guardian of the Person:
>
> > (i) The guardian of the estate;
> >
> > (ii) The spouse, unless estranged or an action for divorce is pending;
> >
> > (iii) An adult child;
> >
> > (iv) A parent;
> >
> > (v) The nominee of a deceased or living parent of an unmarried alleged incapacitated person;
> >
> > (vi) An adult sibling;
> >
> > (vii) An adult grandchild;
> >
> > (viii) Other adult family member;

(ix) An adult who has knowledge of the alleged incapacitated person's preferences and values, including, but not limited to religious and moral beliefs, and would be able to assess how the alleged incapacitated person would make decisions; or

(x) Other qualified proposed guardian, including a professional guardian.

Pa.R.O.C.P. 14.6(b)(1).

Here, the court appointed the guardian of the estate as the guardian of person, which was proper once it removed Father as guardian. **See id.** Father has cited no law that requires the court to appoint a family member, particularly where it has found that such appointment would not be in C.E.P.'s best interest.

In his second issue, Father maintains the court erred and abused its discretion when it denied his request for a continuance so that he could retain counsel. He argues that because the court did not follow the proper procedure for removal of a guardian, he had not been on notice that his removal would be at issue during the hearing. He argues that, because of this lack of notice, the court abused its discretion in denying his request for a continuance.

We review a court's decision to deny a request for a continuance for an abuse of discretion. **See Rutyna v. Schweers**, 177 A.3d 927, 933 (Pa.Super. 2018) (*en banc*). To determine whether the denial of a continuance constituted an abuse of discretion, the reviewing court must consider: (1) whether there was prejudice to the opposing party by a delay, (2) whether opposing counsel was willing to continue the case, (3) the length of the delay

requested, and (4) the complexities involving the present case. *Id.* "An abuse of discretion exists where the trial court's determination overrides or misapplies the law, its judgment is manifestly unreasonable, or the result or partiality, prejudice, bias or ill-will." *Id.*

The trial court denied the continuance because Father had three months to prepare for the hearing, C.E.P.'s counsel would be prejudiced by a continuance, and the proceedings caused stress for C.E.P.:

> Here, the parties did not agree to a continuance. There also were no special grounds advanced before the court to justify a continuance as authorized under the Rule.[4] The

_____

[4] Pennsylvania Rule of Civil Procedure 216 sets forth grounds for continuance:

> (a) The following are grounds for a continuance:
>
> (1) Agreement of all parties or their attorneys, if approved by the Court;
>
> (2) Illness of counsel of record, a material witness, or a party. . . ;
>
> (3) Inability to subpoena or to take testimony by deposition, commission, or letters rogatory, of any material witness, shown by affidavit . . . ;
>
> (4) Such special ground as may be allowed in the discretion of the court;
>
> (5) The scheduling of counsel to appear at any proceeding under the Pennsylvania Rules of Disciplinary Enforcement . . . ;
>
> (6) The scheduling of counsel to appear at any proceeding involving the discipline of a justice, judge or magisterial district judge under Section 18 of Article V of the Constitution of Pennsylvania . . . .

Pa.R.C.P. 216(a).

Court further considered the prejudice to the parties in not proceeding which was directly raised by [Attorney Magee] as an issue at the May 26, 2023 hearing. The complexities and prior history of this case favored denying the continuance since the uncertainty of this process put undue stress on [C.E.P.]. This [c]ourt concluded it was in [C.E.P.'s] best interests to proceed with the hearing on May 26, 2023 to address and conclude all issues raised without the need for a subsequent hearing appearance.

Finally, . . . there was no abuse of discretion or manifest error found. [Father] filed the Petition for Review three months prior to the hearing. [Father] had three months to obtain counsel for the hearing, or consult counsel before proceeding *pro se*. It would be prejudicial to [C.E.P.'s] counsel, who came prepared to dispute the multiple severe allegations asserted in the Petition for Review as well as provide evidence supporting removal of his client's father as guardian of the estate. Finally, this was not the first time [Father] requested a continuance for a Petition he filed in this 2015 case, nor did he even request the continuance prior to the start of the hearing. Accordingly, all factors warranted denial of [Father's] request for a continuance.

Trial Ct. Op. at 19-20.

The orphans' court did not abuse its discretion in denying the continuance. Father had three months between the filing of his petition and the hearing, and C.E.P. and Attorney Magee would be prejudiced by a delay.

In his final issue, Father argues the court committed an error of law and abused its discretion when it denied his request for C.E.P. to testify at the hearing. He argues that under Section 5502, incapacitated persons are to participate as fully as possible in all decisions that affect them. He points out that the court did not find that C.E.P. was not competent to testify.

It is the policy of the statutes governing guardianship to permit incapacitated persons to participate in decisions affecting them as fully as possible:

> Recognizing that every individual has unique needs and differing abilities, it is the purpose of this chapter to promote the general welfare of all citizens by establishing a system which permits incapacitated persons to participate as fully as possible in all decisions which affect them, which assists these persons in meeting the essential requirements for their physical health and safety, protecting their rights, managing their financial resources and developing or regaining their abilities to the maximum extent possible and which accomplishes these objectives through the use of the least restrictive alternative; and recognizing further that when guardianship services are necessary, it is important to facilitate the finding of suitable individuals or entities willing to serve as guardians.

20 Pa.C.S.A. § 5502.

Here, Father called C.E.P. as a witness and counsel for C.E.P. objected, requesting that the court defer a decision until after the remaining testimony had been heard. He did not object based on competency. Rather, Attorney Magee and counsel for the guardian of the estate noted the adverse impact the proceedings had on C.E.P. At the end of the proceeding, the court declined to hear C.E.P.'s testimony. This was not an abuse of discretion, as the court had sufficient information to decide the case without calling C.E.P. to testify.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/4/2024</u>